UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------
                                             X

**Nancy Clayton and Zane A. Miranda (H/W)**,

                                  Plaintiff,

                 -against-

**Bruce E. Katz, M.D., Juva Skin & Laser Center, and Cynosure, Inc.,**

                             Defendants.

----------------------------------------

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: **9·25·12**

10 Civ. 5755 (ALC)

**OPINION & ORDER**

**ANDREW L. CARTER, JR., District Judge:**

## INTRODUCTION

This action arises out of an elective cosmetic facial procedure performed by board-certified dermatologist Bruce E. Katz, M.D. ("Katz") on Nancy Clayton ("Clayton") on May 7, 2008. (Def.'s 56.1 ¶ 9.) The procedure was performed using an 18 watt "SmartLipo laser" distributed by Cynosure, Inc. ("Cynosure").[1] (Def.'s 56.1 ¶ 9.) Among other things, Clayton and her husband, Zane A. Miranda ("Miranda"), (collectively, "Plaintiffs") allege that Katz is liable for medical malpractice for negligently recommending the procedure, which was contraindicated given her history of prior silicone injections, and used excessive energy during the procedure, causing Clayton to sustain serious burns to her face. (Def.'s 56.1 ¶ 9.) Plaintiffs also allege that Katz failed to disclose to Clayton certain facts about the experimental nature and safety of the procedure in addition to the financial relationship between Katz and Cynosure (collectively, "Defendants") relating to the SmartLipo device. (Def.'s 56.1 ¶ 9.) Based on these

---

[1] Plaintiff contends that Cynosure is considered to be the device manufacturer for FDA purposes and for purposes of the present action. (Pl.'s 56.1 ¶ 9.) This determination is not material to the disposition of the current motions.

non-disclosures, Plaintiffs bring a claim of lack of informed consent against Katz in violation of

New York Public Health Law ("PHL") § 2805-d, and a claim of unfair trade practices against

Katz and Cynosure in violation of New York General Business Law ("GBL") § 349.[2]  Plaintiffs

seek punitive damages and bring a loss of consortium claim against both defendants.

Katz moves for partial summary judgment, urging the Court to dismiss Plaintiffs' claim

under GBL § 349 and their claim for punitive damages.  Cynosure also moves for partial

summary judgment, arguing that Plaintiffs have not established a claim under GBL § 349, and

even if they did, there is no basis to subject Cynosure to liability on this ground because there

was no agency relationship between Katz and Cynosure.  Cynosure also seeks dismissal of

Plaintiffs' claims for punitive damages and loss of consortium against it.[3]


## BACKGROUND

### The SmartLipo Laser

In October 2006, the U.S. Food and Drug Administration ("FDA") cleared for marketing

and distribution the first laser-assisted liposuction system in the United States: to wit, a "6 watt

1064 nm Nd:YAG 'SmartLipo' laser." (Def.'s 56.1 ¶ 19.)  Laser-assisted lipolysis ("LAL")

involves the insertion of a cannula, or tube, through a small incision in close proximity to the

treatment area.  (Def.'s 56.1 ¶ 19.)  The cannula contains a laser fiber extending one millimeter

past the end of the cannula, which generates energy when a foot pedal attached to the laser

station is pressed.  (Def.'s 56.1 ¶ 19.)  The laser energy, depending on the wave length, targets

---

[2] Plaintiffs additionally bring claims for products liability, breach of warranty, and negligence against Cynosure. Defendant JUVA Skin & Laser Center ("JUVA") is the fictitious business name of Katz's medical practice and need not be referred to separately for purposes of these motions. (Pl.'s 56.1 ¶ 10.)
[3] Cynosure's Notice of Motion for Summary Judgment indicates it is moving to dismiss the entire Complaint, in addition to Katz's cross-claim for contribution and indemnification, against it. However, Cynosure makes no mention in its moving papers of Plaintiffs' claims for products liability, breach of warranty, and negligence, or of Katz's cross-claims. Thus, the Court does not consider them here.

various substances in fat and skin cells.  (Def.'s 56.1 ¶ 19.)  When the laser cannula, or "wand,"

is moved back and forth, the laser fiber comes into direct contact with the fat cells, causing them

to swell and rupture, leaving an oily residue which is then absorbed into the lymphatic system or

suctioned.  (Def.'s 56.1 ¶ 19.)[4]  LAL is less invasive than traditional liposuction and purportedly

results in less trauma to the surrounding tissue.  Additionally, with LAL, patients have the

opportunity to forego general anesthesia, and patients generally have a shorter recovery time.

(Def.'s 56.1 ¶ 20.)  LAL stimulates production of collagen, causing tissue contraction or "skin-

tightening."  (Def.'s 56.1 ¶ 20.)

Since the FDA's initial clearance of the 6 watt SmartLipo laser, Cynosure has introduced

10 and 18 watt versions of the lasers.  (Def.'s 56.1 ¶ 21.)  Initial versions of the laser required

monitoring surface temperature with an infrared laser thermometer gun during the procedure.

(Def.'s 56.1 ¶ 21.)  George Cho ("Cho"), the senior vice president in charge of marketing and

regulatory affairs at Cynosure, and Dr. Douglas Hendricks ("Hendricks"), Plaintiffs' medical

expert, testified that the most significant treatment parameter is the energy utilized during the

procedure, which is measured in joules, not watts.  (Def.'s 56.1 ¶ 21.)[5]

Katz was one of the first practitioners in the United States to utilize the LAL procedure

following its clearance by the FDA, and he participated in the initial clinical trials of the

SmartLipo laser.  (Def.'s 56.1 ¶ 22.)  On November 18, 2006, Katz entered into a "marketing and

services" agreement with El. En. S.p.A. ("El. En."), the manufacturer of the laser which holds

23% of the stock in Cynosure.  (Def.'s 56.1 ¶ 22.)  This agreement provides that Dr. Katz be

compensated for, among other things, travel for attending peer-reviewed medical meetings,

---

[4] Katz states that the laser cannula comes into direct contact with skin cells, in addition to fat, but Plaintiffs dispute that this is an intended use of the SmartLipo laser.  (Pl.'s 56.1 ¶ 19.)
[5] By contrast, the wattage represents the power setting on the device which in turn determines how quickly energy is delivered into the treatment area. (Pl.'s 56.1 ¶ 21.)

3

speaking at meetings sponsored by Cynosure, demonstrating the use of their products,

developing new applications for the use of the SmartLipo laser, and training new physicians on

the laser. (Def.'s 56.1 ¶ 22.)[6]

**Nancy Clayton and Zane Miranda**

When Dr. Katz performed the procedure in question, Clayton was sixty-four years old.

She is a resident of California who spends approximately one full week per month in New York.

(Def.'s 56.1 ¶ 29.) Clayton's medial history includes endocarditis and heart surgery in her

thirties, prosthetic valve placement in 2001, and use of Coumadin (a blood thinning medication)

since that time. Within a year prior to her treatment with Dr. Katz, Clayton sought and received

treatment for her "festoons," which is described as skin laxity over her cheekbones. Specifically,

Clayton received silicone injections into her cheeks; however, this treatment was not effective.[7]

Miranda is the husband of Clayton and is a board-certified dermatologist. Miranda has

administered Botox to Clayton on previous occasions. (Def.'s 56.1 ¶ 32.)

**Miranda attends a "promotional lecture" given by Dr. Katz**

Miranda testified that in December 2007 he attended a "promotional lecture" given by

Katz at a medical symposium, which consisted of a PowerPoint presentation about the

SmartLipo laser. (Miranda Dep. 21:8–18.) Miranda testified that Katz presented the SmartLipo

laser as a "relatively new procedure" and as another, "arguably better" form of liposuction than

traditional liposuction. (Miranda Dep. 22:4–15.) According to Miranda, Katz "mentioned" that

this device could be used on individuals with loose skin who wanted a tightening of skin without

liposuction, but that this was "not necessarily the primary reason" for it. (Miranda Dep. 22:24–

---

[6] Katz testified that these financial disclosures usually appear in the second slide of his PowerPoint presentations that he uses when giving lectures about the procedure. (Def.'s 56.1 ¶ 22.) However, no such presentations were ever produced because, as testified by Katz, they no longer exist. (Pl.'s 56.1 ¶ 22.)
[7] Clayton has had other cosmetic procedures done to her face in the past, including a facelift in the mid 1990s, Botox injections, and Restylane/Juvaderm injections. (Def.'s 56.1 ¶ 29.)

23:7.) Miranda testified that slides were shown at the lecture but does not remember if any slides were handed out. (Miranda Dep. 23:12–23.) After the lecture, Miranda approached Katz outside the lecture hall and asked him about the possibility of using SmartLipo on his wife's festoons, which she had been complaining about for several months. (Miranda Dep. 24:10–21; 28:6–11.) According to Miranda, Katz thought the procedure would be helpful and told Miranda to send him photographs, after which they would discuss it further over the telephone. (Miranda Dep. 25:10–14.) This was the extent of their conversation at the lecture. (Miranda Dep. 25:4–13; 27:5–13.)

When Miranda returned home, he told his wife that he had attended a lecture on a procedure that "seems to be something that would be applicable to the festoons," and that he spoke with the presenter, Dr. Katz, who "thought it would be a good possibility" and that they should send him pictures. (Miranda Dep. 27:21–28:5.)[8] Clayton was receptive to the idea of trying it, and within a month or so, Miranda sent Katz the photographs. (Miranda Dep. 27:13–20; 29:23–25.) A number of days after sending the photographs, Miranda followed up by calling Katz, who told Miranda that he thought Clayton "was a very good case for the SmartLipo." (Miranda Dep. 30:2–9.) Miranda made an appointment for his wife to see Dr. Katz at that time. (Miranda Dep. 30:10–12.)

**Treatment with Dr. Katz**

On February 7, 2008, Miranda accompanied Clayton to her appointment at Dr. Katz's office. (Def.'s 56.1 ¶ 33.) Katz was made aware of Clayton's medical history, including her prosthetic aortic valve and Coumadin use and her previous facial cosmetic surgery, including the

---

[8] See also Clayton Dep. 103:20–104:2 ("Q. And what did your husband tell you specifically as to what Dr. Katz said at the lecture that would be helpful to your situation?  A. He only told me that he thought that this might be a procedure that would work.  He didn't go into any detail.").

silicone injections. (Def.'s 56.1 ¶ 34.)[9] Katz advised Clayton and her husband that she would have much more bruising and swelling due to her Coumadin intake. (Def.'s 56.1 ¶ 34.). Katz's records note that he assessed the fullness and laxity of Clayton's cheeks and that he discussed the risks, benefits, and alternatives to SmartLipo with Clayton and Miranda (Def.'s 56.1 ¶ 36.)—although Plaintiffs dispute whether this was sufficient under the circumstances. (Pl.'s 56.1 ¶ 36.) Clayton testified that she hoped that the procedure would tighten the skin around the festoons under her eyes and make them less visible, though she did not have an understanding of how this would be achieved. (Clayton Dep. 106:18–107:8.) However, Clayton testified that she did understand that the laser would not be used to remove fat. (Def.'s 56.1 ¶ 36.) While at Dr. Katz's office, Clayton agreed to undergo the procedure, and her husband agreed with her decision. (Def.'s 56.1 ¶ 36.)

At no time prior to the May 7, 2008 procedure did Clayton conduct any research concerning the SmartLipo procedure, and Miranda confirmed that they did not discuss the risks of the procedure or laser procedures in general. (Def.'s 56.1 ¶ 37.) On May 7, 2008, Clayton presented to Dr. Katz's office for the procedure. (Def.'s 56.1 ¶ 38.) Clayton did not receive LAL treatment, but rather underwent a skin-tightening treatment using the SmartLipo laser as a tool. (Pl.'s 56.1 ¶ 21.) Clayton executed two consent forms which expressly noted the risk of objectionable scarring and alterations of skin pigmentation, as well as the possibility that the final results may not be apparent for months postoperatively. (Def.'s 56.1 ¶ 38.) These forms also indicated there were no guarantees to the treatment. (Def.'s 56.1 ¶ 38.) Plaintiffs deny that any consent was effectuated because—although Clayton signed one consent form for liposuction

---

[9] Clayton had silicone injections into her festoon area as late as December 2007, although it is not clear from the record whether Dr. Katz was aware of this. (Def.'s 56.1 ¶ 35.)

and another consent form for laser surgery—Clayton did not receive LAL treatment but underwent a laser skin tightening treatment.  (Pl.'s 56.1 ¶ 38.)

Katz utilized the 18 watt SmartLipo laser machine for the procedure, during which time he delivered a total of 3,199 joules of energy to tissue.[10]  Clayton recalls Katz speaking with his resident or fellow about Clayton's skin temperature while administering the procedure.  (Def.'s 56.1 ¶ 39.)  Katz indicated that there were no complications and that Clayton tolerated the procedure well.  (Def.'s 56.1 ¶ 39.)

Clayton returned to Dr. Katz's office on May 9, 2008, two days after the procedure, and Katz noted in his records that she was "healing well."  (Def.'s 56.1 ¶ 42.)  After this visit, Clayton returned to her home in California.  (Def.'s 56.1 ¶ 42.)  On May 28, 2008, Clayton contacted Dr. Katz's office regarding a white scabbing with redness in the area of her left eye.  (Def.'s 56.1 ¶ 43.)  Between Clayton's first post-operative visit on May 9, 2008, and her second post-operative visit on June 10, 2008, Clayton developed ulcerations on both her checks.  (Def.'s 56.1 ¶ 44.)[11]  On June 10, 2008, Clayton returned to Dr. Katz's office, at which time he performed a debridement of her left cheek ulceration.  (Def.'s 56.1 ¶ 35.)  Clayton returned to Dr. Katz's office on June 15 and 16, 2008.  On this last visit, Katz debrided the ulceration and demonstrated to Dr. Miranda how to perform the debridement when they returned to California.  (Def.'s 56.1 ¶ 47.)

**Subsequent Treatment**

Upon their return home to California, Miranda refused to debride Clayton's wounds.  (Def.'s 56.1 ¶ 49.)  On July 1, 2008, Clayton was seen by Dr. Hendricks for an initial

---

[10] Plaintiffs dispute that the energy was applied to tissue as opposed to the skin but does not cite to any proof for this claim.  (Pl.'s 56.1 ¶ 39.)
[11] According to Plaintiff's expert, Dr. Hendricks, Clayton sustained a thermal burn on May 7, 2008 and opined that complications associated with the burn would have been visible by May 9, 2008.  (Pl.'s 56.1 ¶ 44.)

consultation.  Clayton presented with bilateral face lesions on her cheeks.  (Def.'s 56.1 ¶ 50.)

Dr. Hendricks recommended hyperbaric oxygen treatment for her wounds.  (Def.'s 56.1 ¶ 53.)

Clayton last presented to Dr. Katz on July 14, 2008.  (Def.'s 56.1 ¶ 54.)

## DISCUSSION

### A.    Summary Judgment Standard

Summary judgment is warranted when the moving party shows that "there is no genuine

issue as to any material fact and that the movant is entitled to judgment as a matter of law."

Fed.R.Civ.P. 56(a).  "A dispute about a 'genuine issue' exists for summary judgment purposes

where the evidence is such that a reasonable jury could decide in the non-movant's favor."

Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (citing Guilbert v. Gardner, 480 F.3d

140, 145 (2d Cir. 2007)).  "As to materiality, the substantive law will identify which facts are

material.  Only disputes over facts that might affect the outcome of the suit under the governing

law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant

or unnecessary will not be counted."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

(1986).

In deciding a summary judgment motion, "courts resolve all ambiguities, and credit all

factual inferences that could rationally be drawn, in favor of the party opposing summary

judgment."  Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001) (citations omitted).

However, "'a party may not rely on mere speculation or conjecture as to the true nature of the

facts to overcome a motion for summary judgment. . . . [M]ere conclusory allegations or denials .

. . cannot by themselves create a genuine issue of material fact where none would otherwise

exist.'"  Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (quoting Fletcher v. Atex, Inc., 68

N.3d 1451, 1456 (2d Cir. 1995)).  Rather, the non-moving party must "'offer some hard evidence

showing that its version of the events is not wholly fanciful.'" <u>Golden Pac. Bancorp v. FDIC</u>, 375 F.3d 196, 200 (2d Cir. 2004) (quoting <u>D'Amico v. City of New York</u>, 132 F.3d 145, 149 (2d Cir. 1998)).

**B.    N.Y.G.B.L. § 349**

Section 349 of the New York General Business Law makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state" and entitles to relief "any person who has been injured by reason of any violation of this section." N.Y. Gen. Bus. Law § 349(a) and (h) (McKinney 2012). "[S]ection 349 is directed at wrongs against the consuming public." <u>Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.</u>, 85 N.Y.2d 20, 24 (1995). "[P]rivate . . . disputes unique to the parties . . . [do] not fall within the ambit of the statute." <u>Id.</u> at 25. Therefore, a plaintiff "must, at the threshold, charge conduct that is consumer oriented," <u>New York Univ. v. Continental Ins. Co.</u>, 87 N.Y.2d 308, 320 (1995), which means that "the defendant's acts or practices must have a broad impact on consumers at large." <u>Oswego</u>, 85 N.Y.2d at 25.[12] In making this determination, New York courts may consider the sophistication of the parties and the amount of the transaction at issue—in other words, whether the parties "need the protection" of the consumer-protection law. <u>See</u> <u>Teller v. Bill Hayes, Ltd.</u>, 213 A.D.2d 141, 147, 149 (2d Dep't 1995); <u>Genesco Entertainment v. Koch</u>, 593 F. Supp. 743, 751 (S.D.N.Y. 1984). In short, if a plaintiff does not "plead and prove injury to the public generally, [rather than] just to himself," then he cannot benefit from the consumer protection law found in Section 349. <u>Int'l Sport Divers Ass'n, Inc. v. Marine Midland Bank, N.A.</u>, 25 F. Supp.2d 101, 114 (W.D.N.Y. 1998); <u>see also</u> <u>Securitron</u>

---

[12] "Consumers" have been defined as "those who purchase goods and services for personal, family or household use." <u>See</u> <u>Med. Soc. of State of New York v. Oxford Health Plans, Inc.</u>, 15 A.D.3d 206, 207 (1st Dep't 2005) (quoting <u>Sheth v. New York Life Ins. Co.</u>, 273 A.D.2d 72, 73 (1st Dep't 2000)).

Magnalock Corp. v. Schnabolk, 65 F.3d 256, 264 (2d Cir. 1995) ("[T]he gravamen of the

complaint . . . must be consumer injury or harm to the public interest.").[13]

1. Promotional Lecture

     Plaintiffs argue that Katz's allegedly misleading "promotional lecture" given in

December 2007 was consumer-oriented because it "was targeted toward promoting the

[SmartLipo] device for new uses and potential consumers." (Opp. at 5.)  The Court disagrees.

The lecture given by Katz was directed at physicians, including Miranda, who were attending a

medical symposium.  Where, as here, sophisticated parties such as other physicians act as an

intermediary between the defendant's acts and the ultimate consumer, and the potential that a

consumer "in an inferior bargaining position would be deceived" is greatly reduced, courts have

concluded that the defendant's acts were not consumer-oriented.  See In re Rezulin Products

Liab. Litig., 390 F. Supp. 2d 319, 337 (S.D.N.Y. 2005) (no consumer-oriented conduct where

misleading statements about a diabetes drug were made to administrators of group health benefit

plans and not intended for diabetes patients) (quoting St. Patrick's Home for the Aged and Infirm

v. Laticrete International, Inc.,696 N.Y.S.2d 117, 122 (1st Dep't 1999)); see also Med. Soc. of

State of New York, 15 A.D.3d at 207 (holding that acts "directed at physicians, not consumers"

are not consumer-oriented).  Additionally, the sale of a relatively complicated and expensive

medical device such as SmartLipo is not the type of "more modest" consumer sale transaction to

which the law has generally been held applicable.  See Teller, 213 A.D.2d at 146–47; Genesco,

---

[13] To make out a claim under GBL § 349, a plaintiff also must prove that the defendant's acts were misleading in a material way and that the plaintiff has been injured as a result of the defendant's deceptive acts.  Wilson v. Northwestern Mut. Ins. Co., 625 F.3d 54, 64 (2d Cir. 2010) (citing Oswego, 85 N.Y.2d at 25).

593 F. Supp. at 752. Thus, Plaintiffs have failed to demonstrate that Katz's lecture was consumer-oriented.[14]

## 2. Medical Consent Forms

Plaintiffs additionally argue that Katz's allegedly "deceptive acts were consumer-oriented because the [medical] consent forms he used [with Clayton] would [a]ffect those similarly situated to [her]." (Opp. at 5.) However, Katz's medical consent forms cannot form the basis of Plaintiffs' Section 349 claim either. Plaintiffs rely on Oswego, 85 N.Y.2d at 24 and Phifer v. Home Savers Consulting Corp., No. 06-cv-3841 (JG), 2007 WL 295605 (E.D.N.Y. Jan. 30, 2007), for the proposition that standard-form documents, such as Katz's consent forms, are consumer-oriented. However, these cases do not suggest that a "standard-form document" is in all cases consumer-oriented, and, in any event, these cases are distinguishable from the case at bar. Both Oswego and Phifer involved standard-form documents related to consumer banking. See Oswego, 85 N.Y.2d 20 (standard-form document given to customers opening savings accounts); Phifer, 2007 WL 295605, at *5 (standard-form document given to customers refinancing mortgages). The standard-form documents at issue in this case are medical consent forms. In contrast to the standard banking documents involved in Oswego and Phifer, the disclosures made or not made by a physician to an individual patient prior to treatment do not typically demonstrate an impact on consumers at large. See Karlin v. IVF. Am., 83 N.Y.2d 282, 294 (1999).

---

[14] The Court also notes that the record is completely devoid of any proof, or allegation, that the public at large was harmed by Defendants' conduct, as opposed to merely the Plaintiffs themselves. See Int'l Sport Divers, 25 F. Supp.2d at 114; see also Twentieth Century Fox Film Corp. v. Marvel Enterprises, Inc., 155 F. Supp. 2d 1, 25-26 (S.D.N.Y. 2001) aff'd in part and remanded on other grounds, 277 F.3d 253 (2d Cir. 2002) ("In this case, [the plaintiff's] claim must fail because it does not allege, nor does the record reflect, that defendants' actions caused public harm.").

Moreover, in <u>Oswego</u>, the court determined that the plaintiffs' pension fund administrator was representative of the type of consumer with whom the defendant bank transacted, such that the account openings at issue "were not unique to these two parties, nor were they private in nature." 85 N.Y.2d at 26.  As a result, the court was able to conclude that the acts complained of "potentially affect[ed] similarly situated consumers."  <u>Id.</u> at 27.  Here, however, the record demonstrates that the transaction between Katz and Clayton was not typical of other consumers seeking medical treatment.  Clayton learned about SmartLipo and scheduled an appointment to meet with Katz only after she was referred (in the non-medical sense) to him by her husband, who is himself a board-certified dermatologist.

And in <u>Phifer</u>, which was decided on a motion to dismiss, the court accepted plaintiff's allegation that she was a "relatively unsophisticated" consumer who was misled by the defendant mortgage lender's "standard practice of using misleading HUD-1 forms." 2007 WL 295605, at *5.  As a result, the court concluded that the defendant's "practices have had and may continue to have a broad impact on consumers throughout New York State." <u>Id.</u>  Here, as discussed above, Clayton did not present at Dr. Katz's office as a "relatively unsophisticated" consumer, or as a result of Katz's "standard practice" of receiving referrals, such that a court could conclude that Katz's acts "have had and may continue to have a broad impact on consumers." <u>See</u> <u>id.</u> Thus, Plaintiffs have not shown that Katz's allegedly insufficient consent forms "potentially affect[]" consumers similarly situated to Clayton.  <u>Oswego</u>, 85 N.Y.2d at 26.

Based on the above, the Court finds that there is no genuine issue as to any material fact and that the Defendants are entitled to judgment on the GBL § 349 claims as a matter of law.[15]

---

[15] Since there was no underlying violation of Section 349, the Court need not consider whether Cynosure and Katz had an agency relationship for purposes of marketing SmartLipo.

**B.      Punitive Damages**

Plaintiffs argue that their claims of unfair trade practice, medical malpractice, and lack of informed consent raise a genuine issue of material fact regarding punitive damages. The Court disagrees. Since Plaintiffs' unfair trade practice claim has been dismissed, the only remaining purported bases for punitive damages relates to claims of medical malpractice and lack of informed consent.[16] "In the context of medical malpractice, punitive damages may be recovered when a defendant's conduct evinces 'a reckless indifference equivalent to willful or intentional misdoing' or a 'wanton and reckless disregard of a plaintiff's rights.'" Marsh v. Arnot Ogden Med. Ctr., 937 N.Y.S.2d 383, 385 (3d Dep't 2012) (internal citations omitted). "Punitive damages are warranted where the conduct of the party being held liable evidences a high degree of moral culpability or where the conduct is so flagrant as to transcend mere carelessness." Rey v. Park View Nursing Home, Inc., 692 N.Y.S.2d 686, 689 (2d Dep't 1999) (internal citations omitted).

As to the claim of medical malpractice, the Plaintiffs allege that Katz negligently recommended Clayton for the SmartLipo procedure given her history of prior silicone injections, and used excessive energy during the procedure. However, the record does not show that Katz's recommendation of the procedure "transcend[ed] mere carelessness" or demonstrated the "reckless indifference" to Clayton's medical care to justify a punitive damages award. See Rey, 692 N.Y.S.2d at 689; Marsh, 937 N.Y.S.2d at 385. Nor does the record show that Katz willfully or recklessly disregarded Clayton's safety by expending a total of 3,199 joules of energy during the procedure. In fact, Clayton testified that she recalled Katz continually asking his resident

---

[16] Plaintiffs do not appear to argue that Katz was Cynosure's agent with respect to the performance of the cosmetic procedure. Nor do plaintiffs identify any specific conduct on the part of Cynosure that could warrant punitive damages. Therefore, Cynosure cannot be held liable for punitive damages with respect to the performance of the cosmetic procedure.

about Clayton's skin temperature during the procedure. (Def.'s 56.1 ¶ 39.) While this amount of energy may be determined excessive, Katz's behavior does not "evidence a high degree of moral culpability" required for a finding of punitive damages. See id.

As to the claim of lack of informed consent, the Plaintiffs allege that the standard consent forms Katz gave to Clayton did not contain: (i) information related to SmartLipo, (ii) the experimental nature of the procedure, or (iii) a disclaimer that the procedure being carried out was not, in fact, liposuction. (Opp. at 6.) Plaintiffs also allege that Katz's failure to disclose his financial ties to Cynosure warrants punitive damages. Whether or not a reasonably prudent person in Clayton's position would not have undergone the treatment had she been fully informed of the above omissions, see PHL § 2805-d, nothing in the record demonstrates that Katz was "recklessly indifferent" to Clayton's safety or rights by omitting this information and performing the procedure anyway. The record shows that Clayton knew she was undergoing a skin-tightening procedure that was different from traditional liposuction. The record also shows that Katz told Miranda that the SmartLipo procedure was "relatively new" and an "arguably better" alternative to traditional liposuction, and while skin-tightening was "not necessarily the primary benefit," Katz "thought it could possibly work" on Clayton. Thus, Clayton appeared to be aware, at least in a general sense, of the information allegedly lacking in the consent forms. Further, the cautionary and noncommittal language used by Katz in describing the procedure belies a suggestion that Katz willfully or recklessly failed to disclose these facts to Clayton or acted with a "high degree of moral culpability." See Ray, 692 N.Y.S.2d at 689.

Accordingly, the Court finds that there is no genuine issue as to any material fact and that the Defendants are entitled to judgment on claims for punitive damages as a matter of law.

14

**D.**    **Loss of Consortium Against Cynosure**

Since Dr. Katz is not alleged to have acted as Cynosure's agent with respect to the performance of the procedure, Cynosure cannot be held vicariously liable for Plaintiff Miranda's claim for loss of consortium based on Katz's performance of the procedure. Accordingly, Cynosure's motion for summary judgment on Plaintiff's claim for loss of consortium is granted.

<b>CONCLUSION</b>

For the reasons discussed above, Katz's motion for partial summary judgment is GRANTED and Cynosure's motion for partial summary judgment is also GRANTED.

SO ORDERED.

Dated:        New York, New York
              September 25, 2012

ANDREW L. CARTER, JR.
United States District Judge

15