**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------x

NANCY CLAYTON and ZANE A. MIRANDA    :
(H/W),                               :
                                     :    **1:10-cv-5755 (ALC)**
                          Plaintiffs, :
                                     :    <u>**OPINION & ORDER**</u>
          -against-                  :
                                     :
BRUCE E. KATZ, M.D., and JUVA SKIN & :
LASER CENTER,                        :
                                     :
                         Defendants. :
-----------------------------------------------------------x

**ANDREW L. CARTER, JR., United States District Judge:**                  3-31-15

**I.      INTRODUCTION**

        This is a medical malpractice action arising out of a cosmetic facial procedure performed

by board-certified dermatologist Bruce E. Katz, M.D. ("Dr. Katz") on Plaintiff Nancy Clayton

("Clayton") on May 7, 2008.  The procedure was performed using an 18-watt SmartLipo laser

(the "SmartLipo") distributed by Cynosure, Inc.  Clayton and her husband, Plaintiff Zane A.

Miranda, (collectively, "Plaintiffs") allege that Clayton did not give informed consent and that

Dr. Katz negligently recommended and performed the procedure, causing Clayton to sustain

serious burns to her face.   Presently before the Court is Defendants' motion *in limine*, pursuant

to Rule 26 of the Federal Rules of Civil Procedure ("Rule 26") and Rules 104 and 702 of the

Federal Rules of Evidence ("Rule 104" and "Rule 702", respectively), to preclude Plaintiffs'

proposed expert witness, Dr. Douglas Hendricks, from testifying at trial or, in the alternative,

from testifying about any opinions not contained in his expert report.  For the reasons described

below, that motion is granted in part and denied in part.

## II.   BACKGROUND

### A. Factual Background[1]

The SmartLipo is a laser-assisted liposuction ("LAL") system.  Use of the device involves the insertion of a cannula (i.e., a tube) that contains a laser fiber which generates energy through a small incision in close proximity to the treatment area.  When the laser cannula is moved back and forth, the laser fiber comes into direct contact with fat cells, causing them to swell and rupture, leaving an oily residue which is then absorbed into the lymphatic system or suctioned.  LAL is considered to be less invasive than traditional liposuction and purportedly results in less trauma to the surrounding tissue.  LAL also stimulates production of collagen, causing tissue contraction or "skin-tightening."

Dr. Katz was one of the first practitioners in the United States to conduct the LAL procedure following its clearance by the Food and Drug Adminstration, and he participated in the initial clinical trials of the SmartLipo.  He has an agreement with the manufacturer of the laser which compensates him for, among other things, travel for attending peer-reviewed medical meetings, speaking at meetings sponsored by Cynosure, demonstrating the use of their products, developing new applications for the use of the SmartLipo, and training new physicians on the SmartLipo.

In December 2007, Miranda, a board certified dermatologist, attended a PowerPoint presentation on the SmartLipo.  Dr. Katz described LAL as a relatively new procedure that was "arguably better" than traditional liposuction and which could also be used on individuals with loose skin who wanted to tighten their skin without liposuction.  After the lecture, Miranda

---

[1]     The statement of fact is derived primarily from this Court September 25, 2012 Opinion & Order resolving Defendants' motions for partial summary judgment. *Clayton v. Katz*, No. 10 Civ. 5755(ALC), 2012 WL 4378035, (S.D.N.Y. Sept. 25, 2012).

approached Dr. Katz and they spoke about the prospect of using SmartLipo to eliminate festoons on Miranda's wife, Nancy Clayton. Dr. Katz requested that Miranda send him photographs, which he did, and Miranda then made an appointment for Dr. Katz to see Clayton.

Dr. Katz saw Clayton, who was accompanied by Miranda, on February 7, 2008. Dr. Katz was made aware of Clayton's medical history, including a prosthetic aortic valve, Coumadin use and prior facial cosmetic surgery. The parties dispute whether he was also made aware of Clayton's prior facial silicone injections at this time. Dr. Katz advised Clayton and her husband that she would have much more bruising and swelling due to her Coumadin intake, and his records note that he assessed the fullness and laxity of Clayton's cheeks and that he discussed the risks, benefits, and alternatives to the procedure with Clayton and Miranda. Plaintiffs agreed that Clayton would undergo the procedure. Although Clayton understood that the SmartLipo would not be used to remove fat, she was not aware of how precisely the procedure would remove her festoons. Plaintiffs did not conduct any additional research or discuss the risks of the procedure or laser procedures in general at any time before the procedure in May 2008.

On May 7, 2008, Clayton presented to Dr. Katz's office for the procedure. Clayton did not receive LAL treatment, but rather underwent a skin-tightening treatment using the SmartLipo as a tool. Clayton executed two consent forms, one for liposuction and the other for laser surgery, which expressly noted the risk of objectionable scarring and alterations of skin pigmentation, as well as the possibility that the final results may not be apparent for months postoperatively. These forms also indicated that there were no guarantees to the treatment. Katz utilized the 18-watt SmartLipo machine for the procedure, during which time he delivered a total of 3,199 joules of energy to her facial tissue. Clayton recalls Katz speaking with his resident or fellow about Clayton's skin temperature while administering the procedure. Katz recalls that

3

there were no complications and that Clayton tolerated the procedure well.

Clayton returned to Dr. Katz's office on May 9, 2008, two days after the procedure, and Katz assessed her as "healing well." On May 28, 2008, however, Clayton, who had returned to her home in California, contacted Dr. Katz about white scabbing with redness in the area of her left eye. Clayton also developed ulcerations on both her cheeks between her May 9, 2008 visit with Dr. Katz and her next visit on June 10, 2008. During that June 10, 2008 visit, Katz debrided Clayton's left cheek ulceration. Clayton also returned to Dr. Katz's office on June 15 and 16, 2008, and on the latter visit, Katz debrided the ulceration and instructed Miranda on how to perform the debridement.

Upon their return home to California, however, Miranda refused to debride Clayton's wounds. On July 1, 2008, Clayton was seen by Dr. Douglas E. Hendricks for an initial consultation. Dr. Hendricks assessed bilateral face lesions on Clayton's cheeks and recommended hyperbaric oxygen treatment for her wounds. Clayton last presented to Dr. Katz on July 14, 2008. According to Hendricks, it took three months for Clayton's ulcers to close, and additional healing and scarring was expected for another 12 months after that.

### B. Dr. Douglas E. Hendricks

Dr. Hendricks graduated from University of Louisville's medical school in 1982. (*See* July 18, 2014 Wayne E. Cousin Decl., Ex. F, Hendricks Dep. 7:20-25, August 25, 2011 (hereinafter "Hendricks Dep.").) He subsequently completed a one-year internship, and then a five-year residency in general surgery at the University of Louisville's Department of Surgery. (Hendricks Dep. 7:25–8:11.) After his residency, Dr. Hendricks completed a one-year research fellowship in plastic surgery at the University of Pittsburgh, and then a two-year formal residency in plastic surgery also at the University of Pittsburgh. (Hendricks Dep. 8:12–10:8.)

4

The latter involved "head to toe cosmetic procedures, [and] reconstructive procedures" including

the face. (Hendricks Dep. 10:12-18.)  His clinical work included procedures performed on

festoons, including blepharoplasty, which is a surgical procedure that eliminates excess skin of

the upper or lower eyelids.  (Hendricks Dep. 11:1-14.)

After his residency, Dr. Hendricks served as assistant professor in plastic surgery at

Loma Linda University Medical School for approximately 10 years,  (Hendricks Dep. 12:16-24;

13: 5-11), and later began a private practice concentrated on cosmetic surgery.  (Hendricks

13:15-24.)  Dr. Hendricks is licensed to practice in California, a member of several medical

professional associations devoted to plastic surgery and/or laser medicine, (Hendricks Dep.

48:20-25), and is board-certified in both general surgery and plastic surgery.  (Hendricks Dep.

16:8-11.)  Dr. Hendricks's publications include articles related to facial surgery.  (Hendricks

Dep. 17:2-4.)

Dr. Hendricks frequently uses the SmartLipo equipment in the course of his practice.  He

purchased a SmartLipo machine and underwent a day-long training on the equipment in 2007.

(Hendricks Dep. 22:7-17.)  He has used the machine to perform surgeries on the face, including

approximately 60 to 75 times in the festoon area since 2007, (Hendricks Dep. 46:15-27), and has

conducted lipolysis in the facial area approximately 200 times.  (Hendricks Dep. 49:15-19.)  Dr.

Hendricks has conducted research and lectured about the SmartLipo device, (Hendricks Dep. 52:

5-15), and has also taught the SmartLipo procedure to approximately a half-dozen individuals.

(Hendricks Dep. 55:10-15.)

*1. Dr. Hendricks's March 8, 2010 Expert Report*

Dr. Hendricks reviewed his own medical records and photos and Dr. Katz's medical

records in connection with preparing his expert report.  (Cousin Decl., Ex. F, at 1.)  He had never

treated Clayton before Dr. Katz performed the SmartLipo skin tightening procedure on her on May 7, 2008. (Hendricks Dep. 121:17-19.) The report does not explicitly refer to any studies, experiments, medical articles or guidelines utilized by Dr. Hendricks and is silent regarding the sufficiency of the consent forms executed by Clayton. The report contains three major opinions.

*First,* the report indicates that Clayton was a poor candidate for the procedure performed due to the small amount of tissue in her cheeks and because Clayton's history of liquid silicone injections. (Cousin Decl., Ex. F, at 3.) Dr. Hendricks based the latter opinion on two grounds. *First*, he noted that liquid silicone rendered her a poor candidate because silicone droplets "potentially hold onto heat longer than normal fatty tissues and this would worsen any thermal injury due to prolonged exposure to the heat radiating from the silicone droplets." (Cousin Decl., Ex. F., at 3.). *Second*, he noted that micro scars form around injected silicone and make the tissue less vascular and inhibits the washout of the heat through circulation. (Cousin Decl., Ex. F., at 3.)

*Second*, Dr. Hendricks concluded that plaintiff sustained a fourth-degree burn as a result of excessive energy delivered to the face, and that this resulted from a departure from generally acceptable medical practice. (Cousin Decl., Ex. F., at 4.) He reasoned that the amount of energy applied appeared excessive given the surface area of the region treated. (Cousin Decl., Ex. F., at 4.) Dr. Hendricks also observed that there were no records indicating surface or sub-surface temperatures were monitored by Dr. Katz during the procedure, and noted that such monitoring could have indicated that the excessive energy was being applied. (Cousin Decl. Ex. F, at 4.)

*Third*, Dr. Hendricks determined that Dr. Katz was negligent in his post-operative care of Clayton, including through a failure to timely diagnose Clayton's subsequent injuries. (Cousin Decl. Ex. F, at 4.) He based this opinion on what he found to be the sparse nature of Dr. Katz's

notes, his view that a fourth-degree burn should be easily detectable, and the fact that Clayton

was not seen for an additional two weeks after she reported the scabbing to Katz.  (Cousin Decl.

Ex. F., at 4.)

### C.  Dr. Hendricks's Deposition Testimony

Dr. Hendricks was deposed on August 15, 2011 and September 26, 2011.  He testified

that, by that time, he had reviewed Dr. Katz's deposition transcript, Dr. Katz's and his own

records and photos, the written reports of two defense experts, the Cynosure materials he owned,

as well as the testimony of Miranda and Dr. Katz.  (Hendricks Dep. 82:21–83:19.)  Dr.

Hendricks admitted he had never used SmartLipo machines to merely improve collagen

tightening or tighten skin as Dr. Katz used the machine in this case, though he was aware the

machine could be used for that purpose.  (Hendricks Dep. 53:18–54:5, 124:20-23.)

Dr. Hendricks testified that, in his opinion, in addition to the factors suggesting Clayton's

poor candidacy for the procedure that he identified in his report, her heart condition, including a

heart valve and pacemaker and use of blood thinners, made her a poor candidate for the surgery.

(Hendricks Dep. 114:5-15.)  Dr. Hendricks testified that he acquired this knowledge "in general

surgery 101," and as early as the third year of medical school.  (Hendricks Dep. 114:5–120:16.)

He admitted that he did not know for a medical fact that silicone holds onto heat longer than

human tissue, that he was aware of no written literature or guidelines stating that a history of

silicone is a contraindication to SmartLipo treatment on that basis, and that his opinion in this

regard was a product of "postulation."  (Hendricks Dep. 75:6–76:25, 101:11–103:22.)

Dr. Hendricks also reiterated his view that Dr. Katz used an excessive amount of energy

on Clayton's face.  (Hendricks Dep. 137:3–138:22.)  However, he testified that there are no

written guidelines with respect to the energy or wattage to be utilized on any body part and that

7

his opinion was based on his experience with the Smart Lipo. (Hendricks Dep. 138:23–139:13.) He also testified that it would not be a departure for an advanced practitioner to use SmartLipo in an area where there is injected filler such as silicone, if he or she used extreme caution. (Hendricks Dep. 77:9-13.)

**III.   DISCUSSION**

### A. Preclusion under Rule 26 of the Federal Rules of Civil Procedure

Defendants move under Rule 26 of the Federal Rules of Civil Procedure ("Rule 26") for preclusion of Dr. Hendricks's testimony on issues beyond the scope of his expert report, including any testimony as to whether the surgery was contraindicated by her history of heart issues and whether the consent given by Clayton was sufficiently informed. Under Rule 26, a party "must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703 or 705." If the witness is an expert, "this disclosure must be accompanied by a written report," "prepared and signed by the [expert] witness," which contains, *inter alia*, "a *complete statement* of *all opinions* the witness will express *and the basis and reasons for them*." Fed. R. Civ. P. 26(a)(2)(B)(i) (emphases added). A party's failure to prepare and serve adequate expert reports consistent with this rule is no small matter, as Rule 37(c)(1) of the Federal Rules of Civil Procedure provides that a party is "not allowed to use that witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."

Nonetheless, the Second Circuit has explained that Rule 37-preclusion is not an automatic sanction and that courts should take a flexible approach in response to failures to comply with Rule 26. *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 296-98 (2d Cir. 2006). Among other things, a district court should consider:

8

> (1) the party's explanation for the failure to comply with the
> [disclosure requirement]; (2) the importance of the testimony of
> the precluded witness[es]; (3) the prejudice suffered by the
> opposing party as a result of having to prepare to meet the new
> testimony; and (4) the possibility of a continuance.

*Patterson v. Balsamico*, 440 F.3d 104, 117 (2d Cir. 2006) (alterations in original) (citing *Softel,
Inc. v. Dragon Med. & Scientific Commc'ns, Inc.*, 118 F.3d 955, 961 (2d Cir. 1997)). As a
general rule, "absent prejudice and bad faith, courts will not resort to exclusion." *Plew v. Ltd.
Brands, Inc.*, No. 08 Civ. 3741(LTS)(MHD), 2012 WL 379933, at *6 (S.D.N.Y. Feb. 6, 2012)
(citing *Johnson Elec. N. Am., Inc. v. Mabuchi Motor Am. Corp.*, 77 F. Supp. 2d. 446, 458
(S.D.N.Y. 1999)).

In this case, it is clear that both matters Defendants seek to preclude Dr. Hendricks from
testifying on are not contained in his expert report. As to Clayton's heart-related medical
history, it appears that Plaintiffs seek to elicit such testimony at trial on the grounds that Dr.
Hendricks gave deposition testimony on the subject. It is well-settled, however, that an expert's
deposition testimony cannot cure a party's failure to include opinions in their expert's report
under Rule 26. *See, e.g., Ferriso v. Conway Org.*, No. 93 CIV. 7962 (KMW), 1995 WL 580197,
at *2 (S.D.N.Y. Oct. 3, 1995).

As to the absence of any opinion on informed consent, Dr. Hendricks did not offer any
deposition testimony on the point, and Plaintiffs argue that such testimony is not necessary.
According to Plaintiffs, the adequacy of Clayton's consent is within the competence of a lay jury
to determine because the forms she signed did not specifically relate to the alternative use of the
SmartLipo for its skin tightening effects, or mention the risk of thermal burns from the
procedure. For this proposition, Plaintiffs cite *Tufariello v. Long Island Rail Road Co.*, 458 F.3d
80 (2d Cir. 2006), where the Second Circuit held that expert testimony was not essential for a

9

plaintiff to establish that his long-term exposure to the sounds of train horns caused his hearing loss, 458 F.3d at 87-88, and *People v. Clyde*, 18 N.Y.3d 145 (2011), where the New York Court of Appeals held that expert testimony was not required on the issue of whether the injury and risk of injury to victims elements of assault and unlawful imprisonment were satisfied.  18 N.Y.3d at 154-55.

In contrast to *Tufariello* and *Clyde*, however, New York statutory law explicitly provides that expert testimony is necessary to maintain a claim for lack of informed consent.  *See* N.Y. C.P.L.R. § 4401-a ("A motion for judgment at the end of the plaintiff's case *must be granted* as to any cause of action for medical malpractice based solely on lack of informed consent if the plaintiff has failed to adduce expert medical testimony in support of the alleged qualitative insufficiency of the consent.") (emphasis added); *see also Kourkounakis v. Russo*, 167 F. App'x 255, 257 (2d Cir. 2006) (summary order) (affirming district court's grant of summary judgment to defendant on informed consent claim under CPLR Section 4401-a where plaintiff failed to introduce competent expert evidence in support of his claim).  Plaintiffs have cited no authority authorizing a court to depart from this statutory rule, and this Court's independent research has not uncovered any.  Further, Plaintiffs' argument that such testimony is unnecessary begs a core question at the heart of their informed consent claim: whether the risks attendant to the skin tightening procedure are different from those stated in the consent forms utilized by Dr. Katz in this case.  Deciding that issue is plainly not within the competence of a lay jury.

Notwithstanding Plaintiffs' noncompliance with Rule 26, however, the Court finds that preclusion of such testimony is not warranted, and will reopen discovery for a brief period to allow Plaintiffs to correct the errors.  *See, e.g.*, *Ferriso*, 1995 WL 580197, at *2 ("Although subsequent deposition testimony cannot properly cure a deficiency in an expert's written report,

10

courts should . . . grant litigants' motions to amend their written reports where there is no prejudice to their opponent, or where slight inconvenience to their opponent is outweighed by the need to do substantial justice."). This is appropriate given that there is no evidence of bad-faith by Plaintiffs and, with respect to the informed consent claim in particular, the omission apparently was driven by an honest-yet-mistaken view of the law. *Cf. Ebewo v. Martinez*, 309 F. Supp. 2d 600, 607 (S.D.N.Y. 2004) ("The purpose of the rule is to prevent the practice of 'sandbagging' an opposing party with new evidence."). Moreover, Defendants have not identified any prejudice resulting from Plaintiffs' noncompliance or from reopening the discovery period. That Plaintiffs have asserted their informed consent claim since the outset of this litigation and that Dr. Hendricks testified to the relevance of Clayton's heart issues at his deposition, moreover, strongly suggest that any prejudice will be limited. Finally, the drastic sanction of preclusion is not warranted here given the testimony is vital to Plaintiffs' case, and that exclusion would necessarily result in dismissal of their informed consent claim.[2]

## A. Preclusion under Rules 104 and 702.

Defendants also move to preclude Dr. Hendricks's testimony under Rules 104 and 702. Rule 104(a) provides that district courts must determine "any preliminary question about whether a witness is qualified." Rule 702, which governs the admissibility of opinion witness testimony, provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or

---

[2]        While Defendants also move to preclude Dr. Hendricks from testifying as to the purported "experimental" nature of the procedure performed by Dr. Katz on Clayton, Dr. Hendricks did not express this opinion in his report or at his deposition. Rather, Plaintiffs' counsel has employed this characterization in its submissions to this Court. There being no indication that Dr. Hendricks will testify on this subject, the Court does not address the issue.

11

other specialized knowledge will help the trier of fact to
understand the evidence or to determine a fact in issue; (b) the
testimony is based on sufficient facts or data; (c) the testimony is
the product of reliable principles and methods; and (d) the expert
has reliably applied the principles and methods to the facts of the
case.

As relevant here, then, Rules 104 and 702 require courts to consider two questions. The

first, threshold question is whether the expert is "qualified" within the meaning of the Rules.

This is an important question because experts are "permitted substantially more leeway than 'lay

witnesses in testifying as to opinions that are not rationally based on [their] perception.'" *Nimely

v. City of N.Y.*, 414 F.3d 381, 395 n. 11 (2d Cir. 2005), (quoting *United States v. Garcia*, 291

F.3d 127, 139 & n. 8 (2d Cir. 2002)). Nevertheless, if the expert is qualified within the meaning

of Rule 702, the Court must then determine whether the expert's opinion is sufficiently reliable,

or in other words, make "an assessment of whether the reasoning or methodology underlying the

testimony is scientifically valid and of whether that reasoning or methodology properly can be

applied to the facts in issue." *In re U.S. Foodservice Inc. Pricing* Litigation, 729 F.3d 108, 129

(2d Cir. 2013) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592-93 (1993)).

The proponent of expert testimony bears the burden of establishing admissibility by a

preponderance of the evidence. *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007).

There is, however, "a presumption of admissibility of expert evidence and 'the rejection of

expert testimony is the exception rather than the rule.'" *Oleg Cassini, Inc. v. Electrolux Home

Prods., Inc.*, No. 11 Civ. 1237(LGS)(JCF), 2014 WL 1468118, at *6 (S.D.N.Y. Apr. 15, 2014)

(quoting Fed. R. Evid. 702 advisory committee's note) (internal citation omitted).

*1. Qualified Prong*

As noted, Rule 702 expressly provides that a witness may be "qualified as an expert by

12

knowledge, skill, experience, training, *or* education." (emphasis added).  Courts in this Circuit

liberally construe these requirements.  *See United States v. Brown*, 776 F.2d 397, 400 (2d Cir.

1985) (qualification requirements of Rule 702 "must be read in light of the liberalizing purpose

of the rule"); *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 559 (S.D.N.Y. 2004) ("The

Second Circuit has taken a liberal view of the qualification requirements of Rule 702, at least to

the extent that a lack of formal training does not necessarily disqualify an expert from testifying

if he or she has equivalent relevant practical experience.").  Accordingly, "[a]n expert's training

need not narrowly match the point of dispute in the case," *Colon ex rel. Molina v. BIC USA, Inc.*,

199 F. Supp. 2d 53, 73 (S.D.N.Y. 2001), and doctors in particular need not be "specialist[s] in

the exact area of medicine implicated by the plaintiff's injury."  *In re Fosamax Prods. Liab.*

*Litig.*, No. 06–cv–7631, 2009 WL 4042769, at *6 (S.D.N.Y. Nov. 23, 2009) (citing *McCullock v.*

*H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir. 1995)); *see also Yaccarino v. Motor Coach Indus.,*

*Inc.*, No. 03-CV-4527 (CPS), 2006 WL 5230033, at *9 (E.D.N.Y. Sept. 29, 2006) (collecting

cases and observing that district courts "need not preclude an expert from testifying merely

because he or she does not possess experience tailored to the precise product or process that is

the subject matter of the dispute").

    Applying these principles to this case, Defendants' argument that Dr. Hendricks is

unqualified because he has never used the SmartLipo for the procedure performed on Clayton

must be rejected.  Dr. Hendricks maintains an active clinical practice in cosmetic surgery and is a

member of professional associations devoted to plastic and laser surgery.  He has been formally

trained in the use of SmartLipo, has performed over 200 lipolysis facial procedures, and has used

the SmartLipo in the festoons area approximately 65 to 70 times.  He also treated Clayton after

the procedure, and has reviewed Dr. Katz's medical records, pre-operative photographs,

13

deposition testimony and a relevant report authored by an expert in the SmartLipo field.  That he

and Dr. Katz did not use the SmartLipo for identical purposes, does not mean that he is

unqualified to render opinions about Dr. Katz's procedure.  That fact goes to the weight and

credibility of his testimony, both of which are traditionally explored on cross-examination.

*McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043-44 (2d Cir. 1995).

### 2.  *Reliability prong*

The reliability inquiry, meanwhile, is a fluid one, which "will necessarily vary from case

to case."  *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002).  The

objective of the inquiry is "to make certain that an expert, whether basing testimony upon

professional studies or personal experience, employs in the courtroom the same level of

intellectual rigor that characterizes the practice of an expert in the relevant field."  *Kumho Tire*

*Co. v. Carmichael,* 526 U.S. 137, 152 (1999).  District courts are accorded substantial discretion

in determining whether this prong has been satisfied in any case.  *Id.*  Judges are generally

guided by the four non-exhaustive factors identified by the Supreme Court in *Daubert v. Merrell*

*Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993):

> (1) whether a theory or technique "can be (and has been) tested,";
> (2) "whether the theory or technique has been subjected to peer
> review and publication,"; (3) a technique's "known or potential
> rate of error," and "the existence and maintenance of standards
> controlling the technique's operation,"; and (4) whether a
> particular technique or theory has gained "general acceptance" in
> the relevant scientific community.

*Amorgianos,* 303 F.3d at 266 (citations omitted).  In this case, the Court finds that, with one

exception, Dr. Hendricks's testimony is reliable under Rule 702 because it is well-grounded in

his education, practical experience and training, his review of the relevant medical records and

his treatment of Clayton.

14

First, with respect to Dr. Hendricks's conclusion that Clayton was a poor candidate for the procedure because of her medical history, the paucity of tissue in her cheek mounds and the scarring from prior silicone injections, the Court is satisfied that this opinion is grounded in sufficient facts and data, including Clayton's medical history, the pre-operative photographs and Dr. Hendricks's post-operative physical examination. The Court is also satisfied that the methodology Hendricks applied in developing this opinion, in using his knowledge and experience from his training in general and plastic surgery and from his own extensive use of the SmartLipo, renders his opinion reliable. Defendants' objections that the opinion is dubious in light of Dr. Hendricks's admissions that he has performed SmartLipo surgeries on high-risk patients and that he was unable to identify the precise location of Clayton's prior silicone injections to her cheeks are topics for cross-examination.

Next, the Court finds that Dr. Hendricks's opinion regarding Dr. Katz's excessive use of energy based on the size of the area treated also satisfies *Daubert* standards. The opinion is based on Dr. Hendricks's knowledge of and experience using the SmartLipo laser on parts of the body with varying surface areas. While Defendants fairly point out that, as expressed in his report, the opinion appears to be based in part on Dr. Hendricks's erroneous belief that Dr. Katz did not monitor the surface and subsurface temperatures of Clayton's skin during the procedure, this misapprehension alone does not render his opinion unreliable. *See Loyd v. United States*, No. 08 Civ. 9016(KNF), 2011 WL 1327043, at *5 (S.D.N.Y. March 31, 2011) ("A proposed expert's omission or misapprehension of certain facts may not warrant preclusion *per se*.") (citing *Am. Home Assurance Co. v. Merck & Co.*, 462 F. Supp. 2d 435, 452 (S.D.N.Y. 2006)). While he was mistaken, the inference Dr. Hendricks drew was not unreasonable under the circumstances, and it is not essential to his opinion that the amount of energy Dr. Katz applied

15

was excessive in any event.

Similarly, Dr. Hendricks's opinion that Dr. Katz failed to timely diagnose Clayton's injuries will also not be precluded.  This opinion is based on Dr. Hendricks's post-operative examination and treatment of Clayton and his experience as a treating clinical physician, which includes a prior treatment of a patient with a similar thermal injury resulting from a SmartLipo procedure he conducted.  (Hendricks Dep. 31:19–38:17.)  To the extent it is true that, as Defendants suggest, Dr. Hendricks's treatment records are inaccurate or incomplete, or that he failed to give sufficient weight to alternative causes and factors, this is again a matter to be raised during cross-examination at trial.

Finally, however, the Court finds that Dr. Hendricks's testimony on the "potential" interaction between laser energy and silicone droplets does not survive *Daubert* scrutiny.  The opinion is couched in the most speculative of terms in Dr. Hendricks's report, and Dr. Hendricks was also unable at his deposition to provide any basis for the opinion beyond his supposition.  (Hendricks Dep. 75:6–76:25, 101:11–103:22; Cousin Decl. Ex. F, at 4.)  Further, Plaintiffs have not qualified Dr. Hendricks as an expert in medical engineering, or any other filed relevant to the properties of silicone droplets, and there is no evidence in the record that Dr. Hendricks has relevant clinical experience, laboratory research or any background or experience in the field which would qualify him to give expert testimony on the subject.  Dr. Hendricks is thus precluded from offering any testimony on laser-silicone droplet interaction.

## IV.    CONCLUSION

For the reasons described above, Defendants motion *in limine* to preclude Dr. Hendricks's expert testimony and to dismiss this action is **GRANTED IN PART** and **DENIED IN PART.**  Discovery is hereby reopened for the purposes indicated in this Opinion & Order,

and will close on **May 15, 2015**.  The parties should also provide the Court with a joint status

report on **May 18, 2015.**


**SO ORDERED.**

**Dated:**  March 31, 2015

        **New York, New York**

                            **ANDREW L. CARTER, JR.**
                            **United States District Judge**

17